**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**RICHARD H.,**

                              **Plaintiff,**

**v.**                                                                          **1:19-CV-128 (NAM)**

**ANDREW M. SAUL, COMMISSIONER
OF SOCIAL SECURITY,**

                              **Defendant.**
_____

**Appearances:**

Lewis B. Insler
17 Newcomb Place
White Plains, New York 10606
*Counsel for Plaintiff*

June L. Byun
Social Security Administration
Office of Regional General Counsel - Region II
26 Federal Plaza - Room 3904
New York, New York 10278
*Counsel for Defendant*

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

        Plaintiff Richard H. filed this action under 42 U.S.C. § 405(g), challenging the denial

of his applications for Social Security Disability ("SSD") insurance benefits and

Supplemental Security Income ("SSI").  (Dkt. No. 1).  The parties' briefs are presently

before the Court.  (Dkt. Nos. 11, 13).  After carefully reviewing the administrative record,

(Dkt. No. 10), and considering the parties' arguments, the Court affirms the denial decision,

for the reasons that follow.

## II.    BACKGROUND

### A.    Procedural History

On April 20, 2015, Plaintiff filed a Title II application for a period of SSD benefits, as well as a Title XVI application for SSI benefits, alleging that he had been disabled since December 31, 2009.  (R. 171).  Plaintiff claims that he is disabled due to bipolar disorder, anxiety, and type 2 diabetes.  (R. 211).  The Social Security Administration ("SSA") denied Plaintiff's applications on May 16, 2015.  (R. 93–95).  Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 108–09).  The hearing was held on September 11, 2017 before ALJ Sharda Singh.  (R. 31–72).  Plaintiff testified at the hearing, as did a Vocational Expert ("VE").  (*Id.*).  On December 27, 2017, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 11–30).  Plaintiff's subsequent request for review by the Appeals Council was denied on January 7, 2019.  (R. 1–6).  Plaintiff then commenced this action on January 30, 2019.  (Dkt. No. 1).

### B.    Plaintiff's Background and Testimony

Plaintiff was born in 1960.  (R. 171).  He obtained a GED in 1976 and has previously worked as a computer repair technician, a surveyor's assistant, and a delivery driver.  (R. 212, 239).  Plaintiff completed a function report in which he described that he lives alone and requires help with personal care and other activities of daily living "when [his] mental health symptoms are exacerbated."  (R. 229–30).  He stated that he can drive, leave his home alone, and shop for groceries and personal care items.  (R. 232).  He stated that he spends his days listening to and recording music, reading and spending time on the computer.  (R. 56, 233).  He noted that he can do these things on a daily basis and has no problems getting along with others, unless he is depressed.  (R. 233–34).  Plaintiff reported that he is able to manage his finances without limitation.  (R. 233).

Plaintiff explained that he "recently became more isolated, unhappy, paranoid, anxious, distrusting and shut down." (*Id.*). He claimed that he "cannot focus at times due to increased anxiety and when in a manic phase." (R. 235). He reported that he can finish what he starts when he is able to focus, and that he can "somewhat" follow written and spoken instructions. (R. 235–36). Plaintiff noted that stress and changes in schedule may increase his anxiety and affect his ability to adapt. (R. 236). Plaintiff stated that he suffers from anxiety attacks on a daily basis that can last 2 hours. (R. 237). He stated that he receives treatment for his mental health problems at least once a week, and reported that "[t]reatment helps to a large extent." (*Id.*).

At the hearing, Plaintiff testified that that he sees a psychologist weekly for ongoing therapy, and a psychiatrist bi-monthly for medication management. (R. 41–42). Plaintiff explained that he is "immobilized" with his depression, and that he is not able to function socially or physically. (R. 42–43). He stated that his manic and depressive phases can occur "once every two or three months." (R. 45). Plaintiff stated that when he is depressed he has to "make an effort and get up and . . . try to make [him]self do something." (R. 52). He explained that he takes twelve different medications that help to a degree and prevent his more intense symptoms. (R. 45–46). Plaintiff reported that he has difficulty dealing with crowds because they cause anxiety and make him feel claustrophobic. (R. 53). Plaintiff reported difficulty concentrating on tasks, and estimated that he can only concentrate for 10 to 20 minutes at a time. (R. 61).

With regard to his physical limitations, Plaintiff stated that he could lift 50 to 70 pounds, and he estimated that he could walk for 45 minutes before needing to stop. (R. 57). Plaintiff explained that he suffers from diabetic neuropathy in his feet causing them to feel

cold, sensitive, and painful. (R. 50–51). He further noted that he had lost 55 pounds in the past year due to nausea and esophagitis. (R. 47–48).

### C. Medical Evidence of Disability[1]

Plaintiff's disability claim stems from his continued struggle with bipolar disorder, depression, anxiety, and type 2 diabetes. He claims that he has struggled with these conditions since the 1990s and has received treatment from a number of medical providers. (R. 236–37).

#### 1. Mental Health Treatment

##### a. Institute for Family Health

Plaintiff received mental health counseling at The Institute for Family Health ("IFH") from March 2012 through July 2017. (*See generally* R. 386–630, 679–1023, 1046–1455). He was seen by numerous treating providers at IFH during that time. In March 2013, Cynthia Kim, a Licensed Clinical Social Worker ("LCSW"), diagnosed Plaintiff with "major depressive disorder" and "anxiety." (R. 414–15). Plaintiff frequently reported symptoms of agitation, anxiety, depressed mood, feelings of helplessness and hopelessness, loss of energy, difficulty with concentration, impulsivity, and loss of interest in and fear of meeting new people. (*See, e.g.*, R. 402–03, 471, 553–54, 687, 834, 937, 990, 1070, 1344, 1453). Treatment notes indicate that Plaintiff's compliance with his medication regimen was sporadic, though he took his medication more regularly after he enrolled in weekly counseling. (*Compare* R. 437, 451, 553, 612, 703, *with* 526, 620, 687, 895, 914, 1018, 1050, 1070, 1321, 1429). Plaintiff reported having suicidal thoughts multiple times a day, and he frequently presented with passive suicidal ideation. (*See, e.g.*, R. 958, 1289, 1453).

---

[1] The Court has only considered the medical evidence regarding Plaintiff's mental health issues because his challenges to the ALJ's decision only relate to ALJ's treatment of his mental impairments and limitations. (*See generally* Dkt. No. 11, pp. 11–26).

Throughout his treatment at IFH, Plaintiff reported some improvements in his mood and anxiety levels. (*See, e.g.*, R. 492, 499, 809, 1060, 1103). Treatment notes from August 2016 indicate that Plaintiff continued to struggle with mental health issues, but that he "seem[ed] to show some improvement overall in his depression and anxiety." (R. 1103).

### b. James P. Thalmann, Ph.D.

Plaintiff saw Dr. James P. Thalmann for treatment of his mental health issues from March 2015 through February 2016. (*See generally* R. 339–43, 649–678). On his new patient intake form, Plaintiff indicated that he was suffering from "severe angst and mania." (R. 662). Plaintiff reported that his moods "just happen," and that he "can't control them." (R. 663).

In June 2015, Dr. Thalmann completed a Medical Source Statement for Plaintiff. (*See* R. 675–78). Dr. Thalmann noted that Plaintiff could drive and regularly perform activities of daily living. (R. 677). He opined that Plaintiff "would be highly disruptive and highly disorganized" in a work setting, and described Plaintiff's social interaction as "very impulsive [and] disruptive." (*Id.*). Dr. Thalmann stated that Plaintiff had no limitations to understanding and memory, but found that Plaintiff was limited in his ability to maintain "sustained concentration and persistence." (*Id.*). He assessed that changes in a work setting would increase Plaintiff's irritability. (R. 678). Dr. Thalmann wrote that Plaintiff "has struggled to subsist" and that he would be "unable to conform to [a] work setting or have sustained activity." (*Id.*).

Dr. Thalmann's treatment notes show that Plaintiff's mood was generally "stable" and "euthymic." (R. 650, 652–57, 659). In November 2015, Dr. Thalmann described Plaintiff's condition as "less depressed" and "not manic." (R. 658). In February 2016,

treatment notes show that Plaintiff's mood was "stable," he was compliant with his medications, and he was "reasonably optimistic." (R. 659–60).

### c. Four Winds Saratoga

Plaintiff was treated for mental health issues at Four Winds Saratoga, a mental health facility that provides inpatient and outpatient treatment services. (*See* R. 350–78, 1024–45). The records indicate that Plaintiff was admitted to inpatient treatment on multiple occasions in 2015 and 2016. (*Id.*).

In July 2015, Plaintiff was admitted to Four Winds to "address symptoms of mania and suicidal ideation with a plan to shoot himself." (R. 350). Plaintiff reported that he "was experiencing worsening mania over the past couple of months which have impaired his ability to function in his daily life." (*Id.*). He said that he "felt increasingly hopeless and felt unable to contract for safety outside of the hospital." (*Id.*). Intake records indicate that:

> Patient states he brought himself to Albany Med ED for evaluation and medication management. Patient stated to the ED he was "manic, bipolar with thoughts of committing suicide." He has had manic episodes of being "talky, nervous, hyper, and hypersexual." Stated he gets in rages but not in the angry way. If he is being creative he can stay up all night. Patient presents with symptoms of mania and suicidal thoughts, is unable to be managed in the community.

(R. 359). Upon discharge, treatment notes indicate that Plaintiff exhibited "normal" mood, affect, and attention span; "appropriate" thought content and perceptions; and "good" insight, judgment, and impulse control. (R. 351–52). His thought processes were "clear [and] organized," and he exhibited "no suicidal ideation." (R. 351).

In January 2016, Plaintiff was admitted to Four Winds to treat his "symptoms of mania, poor concentration, sleeplessness, and anhedonia." (R. 1024). He described that he was anxious, not sleeping, felt helpless, and was suffering from constant racing thoughts. (R. 1031). Upon discharge, treatment notes indicate that Plaintiff exhibited "normal" mood,

affect, and attention span; "appropriate" thought content and perceptions; and "good" insight, judgment, and impulse control. (R. 1026). His thought processes were "clear [and] organized," and he exhibited "no suicidal ideation." (*Id.*).

Plaintiff was admitted to Four Winds again in June 2016 for "mood lability and daily suicidal ideation." (R. 1034). The treatment notes indicate that Plaintiff reported that he was "extremely anxious, not sleeping, [had] constant racing thoughts, auditory/visual hallucinations, presents with elevated mood, [and] pressured speech." (R. 1041). Upon discharge, treatment notes indicate that Plaintiff had "normal" mood, affect and attention span; "appropriate" thought content and perceptions; and "good" insight, judgment, and impulse control. (R. 1036).

### 2.     Psychiatric Consultative Evaluation

In August 2015, Plaintiff presented to Lauren Stack, Ph.D. for a psychiatric evaluation. (R. 380–84). Plaintiff reported that "[h]e has never been able to maintain long-term employment," and noted that he was fired from his last job for "being late and also because of the impact that his bipolar disorder has on his ability to work." (R. 380). He informed Dr. Stack that he had been hospitalized for suicidal thoughts in July 2015. (*Id.*). He explained that he was enrolled in weekly counseling sessions with a social worker, and that he was receiving ongoing treatment with a psychologist and a psychiatrist. (*Id.*).

Dr. Stack noted that Plaintiff endorsed symptoms of depression including dysphoric mood, crying spells, hopelessness, irritability, difficulty sleeping, fatigue, diminished self-esteem, and concentration difficulties. (R. 381). Plaintiff stated that he suffered from panic attacks several times daily, and described his symptoms of mania including "inflated self-esteem, more talkative, distractibility, decreased need for sleep, flight of ideas,

elevated/expansive mood, and occasional bouts of spending too much money." (*Id.*).
Plaintiff denied any suicidal ideation. (*Id.*).

Dr. Stack noted that Plaintiff's thought processes were "coherent and goal directed"
with no evidence of hallucinations, delusions, or paranoia. (R. 382). She noted that his
mood was "euthymic," and found that his affect showed a "full range and appropriate in
speech and thought content." (*Id.*). Dr. Stack reported that Plaintiff's memory skills,
attention, and concentration were all "intact," and she noted that he was able to count and
conduct simple calculations." (*Id.*). She found that Plaintiff's insight and judgment were
"fair" and that his cognitive functioning appears "within the average range." (R. 383). Dr.
Stack also noted that Plaintiff "is able to dress, bathe, groom himself, cook, clean, do
laundry, shop, manage money, drive, and take public transportation." (*Id.*).

Dr. Stack's medical source statement concluded that:

> The claimant has no impairment in his ability to follow and
> understand simple directions and instructions, perform simple
> tasks independently, or maintain attention and concentration.
> The claimant has mild impairment in his ability to learn new tasks
> and make appropriate decisions. The claimant has moderate
> impairment in his ability to maintain a regular schedule, perform
> complex tasks independently, relate adequately with others, and
> appropriately deal with stress. These difficulties are caused by
> symptoms of bipolar disorder, anxiety, and panic.

(*Id.*). She found that Plaintiff's prognosis was "fair given that he is aware of his problems, in
treatment, and compliant on his medication." (R. 384). She recommended that Plaintiff
"continue with psychological and psychiatric treatment as currently provided." (*Id.*).

### 3. Third Party Function Report

In June 2015, Julie Ransom, Plaintiff's long-time friend and mother of their
daughter, completed a Third Party Function Report describing her view of Plaintiff's
limitations. (*See* R. 220–27). Ms. Ransom reported that she has known Plaintiff for 18

years and said that she spends time with him every day for family activities. (R. 220). She stated that Plaintiff "can be difficult to get along with, and seems depressed often." (*Id.*). She also stated that Plaintiff has no problems with personal care, but she described him as "obsessive compulsive" and "overly self-conscious." (R. 221).

Ms. Ransom noted that Plaintiff attends weekly Alcoholics Anonymous ("AA") meetings and goes to the gym three or four times per week. (R. 224). She opined that she thought Plaintiff's conditions affect his memory, concentration, understanding, interpersonal relationships, and his ability to complete tasks and follow instructions. (R. 225). She said Plaintiff "does not like taking orders," cannot handle stress, and "can become defensive, and feel victimized unwarrantedly." (R. 226). In sum, Ms. Ransom stated that she believes his mental impairments have prevented him from functioning well in society, maintaining a job, and keeping friends. (R. 227).

### D.    ALJ's Decision Denying Benefits

On December 27, 2017, the ALJ issued a decision denying Plaintiff's application for disability benefits. (R. 14–26). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since December 31, 2009, the alleged onset date of his disability. (R. 13). The ALJ also determined that Plaintiff's date last insured was June 30, 2011. (R. 14).

At step two, the ALJ found that, under 20 C.F.R. §§ 404.1520(c), 416.920(c), Plaintiff had four "severe" impairments: diabetes mellitus, obesity, bipolar disorder, and anxiety disorder. (R. 16).

At step three, the ALJ found that, while severe, Plaintiff did not have an impairment or combination of impairments that met the criteria for one of the impairments listed in 20

C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  (R. 17–19).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC"), finding that:

> [Plaintiff] has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that [he] can never climb ladders, ropes or scaffolds.  [Plaintiff] can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  [Plaintiff] is limited to understanding, remembering and carrying out simple, routine and repetitive non-complex tasks.  [Plaintiff] must avoid crowds, defined as over 100 people.

(R. 19).  The ALJ's underlying analysis explains that her assessment "is supported by the medical evidence of record, by the opinions of Dr. Stack, and to a lesser extent by the opinions of Dr. [Thalmann], Dr. Ferrin and Ms. Ransom."  (*See* R. 19–24).

At step four, the ALJ determined that Plaintiff would be unable to perform any of his past work because the demands of those jobs would exceed the RFC.  (R. 24–25).

At step five, the ALJ determined that, based on Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff could perform.  (R. 25–26).  Specifically, citing testimony from the VE, the ALJ found that Plaintiff would be able to work as a laundry worker, laborer, or a food service worker.  (*See id.*).  Thus, the ALJ concluded that Plaintiff was not disabled under Sections 216(i), 223(d), or 1614(a)(3)(A) of the Social Security Act.  (R. 26).

## III.   DISCUSSION

### A.  Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

10

In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The Regulations define residual functional capacity as "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545, 416.945. In assessing the RFC of a claimant with multiple impairments, the SSA considers all "medically determinable impairments," including impairments that are not severe. *Id.* at §§ 404.1545(a)(2), 416.945(a)(2). The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the

administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may only reject the facts found by the ALJ "if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

**C. Analysis**

Plaintiff appears to challenge the ALJ's decision regarding his SSI application on two grounds: (1) the ALJ incorrectly weighed the medical evidence; and (2) the misevaluation of the evidence resulted in an "incomplete RFC" and flawed vocational assessment. (Dkt. No. 11, pp. 13–24). The Court will address each argument in turn.[2]

---

[2] Plaintiff does not appear to challenge the ALJ's denial of his application for SSD benefits. As Plaintiff recognizes, to obtain SSD benefits, he must prove disability prior to his date last insured, June 30, 2011. (Dkt. No. 11, pp. 6–7). However, there is almost no evidence for this period, and Plaintiff does not articulate any argument that the ALJ erred in denying SSD benefits. After review of the record, the Court finds no basis for one.

## 1.     Evaluation of the Medical Evidence

Plaintiff first argues that the ALJ erred by not giving more weight to the opinion of his treating provider, Dr. Thalmann.  (Dkt. No. 11, pp. 14–15).  He claims that the ALJ should have provided greater weight to Dr. Thalmann's Medical Source Statement because it was consistent with other "longitudinal" evidence showing that Plaintiff suffered from "rapid cycling bipolar disorder."  (*Id.*, p. 15).  Plaintiff argues that the ALJ's "failure to give Dr. Thalmann's report great or controlling weight under the treating physician rule is a remandable error of law."  (*Id.*, pp. 15–16).  Plaintiff also asserts that the ALJ should have reached out to Dr. Thalmann with regard to treatment notes that the ALJ could not decipher.  (*Id.*, p. 11).

In response, the Commissioner argues that the ALJ "carefully considered all of the evidence of record," and "properly exercised her discretion in resolving the evidentiary conflicts presented in the opinion evidence of record and assessed an RFC that is supported by substantial evidence."  (Dkt. No. 13, p. 9).  The Commissioner contends that the ALJ credited "Dr. Thalmann's opinion that Plaintiff had limitations in sustained concentration and persistence, and appropriately limited Plaintiff to work involving simple, routine, and repetitive non-complex tasks."  (*Id.*, p. 10).  The Commissioner adds that the ALJ was not obligated to recontact Dr. Thalmann to supplement and clarify his treatment notes because "the ALJ had [a] significant medical record at her disposal and substantial evidence for the RFC determination."  (*Id.*, p. 11).

Generally, under the treating physician rule, a hearing officer owes "deference to the medical opinion of a claimant's treating physician."  *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)).  However, "[w]hen a treating physician's opinion is not consistent with other substantial

evidence in the record, such as the opinions of other medical experts, . . . the hearing officer

need not give the treating source opinion controlling weight." *Id*. Thus, "the Commissioner

retains the discretion to reach a conclusion inconsistent with an opinion of a treating physician

where that conclusion is supported by sufficient contradictory evidence." *Cohen v. Comm'r

of Soc. Sec*., 643 F. App'x 51, 53 (2d Cir. 2016) (noting that an opinion from a claimant's

treating physician is "not absolute"). And, while the Second Circuit has "cautioned that ALJs

should not rely heavily on the findings of consultative physicians after a single examination,"

*Selian*, 708 F.3d at 419, an opinion from a consultative medical examiner may nonetheless

constitute substantial evidence, *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (citing

*Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (per curiam)).

Upon review of the record, the Court finds that the ALJ did not err in assigning less

than controlling weight to Dr. Thalmann's Medical Source Statement. (*See* R. 22, 339–42).

The ALJ's decision explains that Dr. Thalmann's assessment was only entitled to "some

weight" because several of his opinions were not supported in his treatment notes, such as

Plaintiff's limitations in social interaction due to being disruptive and impulsive and his

limitations in adaptation due to irritability. (R. 22). Indeed, Dr. Thalmann's treatment notes

show that Plaintiff's mood was generally "stable," "balanced," and "euthymic." (*See* R. 650–

60).[3] Thus, the Court finds no error in the ALJ's conclusion that the more restrictive mental

limitations in Dr. Thalmann's Medical Source Statement were not supported by his underlying

treatment records.

Further, the ALJ gave less weight to Dr. Thalmann's opinion because it was

contradicted by other substantial evidence. For example, Dr. Stack examined Plaintiff and

---

[3] The Court also notes that Dr. Thalmann's treatment records lack substantive detail as to Plaintiff's mental condition, often providing only a few brief lines of abbreviated text per visit, and only span from March 2015 through February 2016. (*See* R. 339–42, 649–64).

found that he was "cooperative," and exhibited a "euthymic mood" and "appropriate affect." (R. 22). Dr. Stack also found that Plaintiff had "intact attention and concentration and intact recent and remote memory skills, average cognitive functioning, and fair insight and judgment." (R. 22–23). In Dr. Stack's assessment, Plaintiff had "moderate limitations in his ability to maintaining a regular schedule, to perform complex tasks independently, to relate adequately with others, and to appropriately deal with stress." (R. 23). The ALJ assigned Dr. Stack's opinions "great weight" because she "personally examined the claimant," and her conclusions were "consistent with the treatment notes [from Dr. Thalmann], which show that the claimant had some difficulties with attention and concentration and with social functioning due to his impairments." (R. 23).[4]

Dr. Thalmann's more restrictive opinions are also inconsistent with Plaintiff's activities of daily living. Plaintiff reported to Dr. Stack that he is able to attend to his own personal care needs, cook, clean, do laundry, shop, manage money, drive, and take public transportation. (R. 383). Ms. Ransom stated that Plaintiff goes to the gym three to four times a week and attends AA meetings once or twice a week. (R. 224). Plaintiff also maintains an active role in raising his daughter. (*See* R. 220–21). Ms. Ransom reported spending time with Plaintiff "everyday [for] family activities," and she noted that Plaintiff is able to prepare meals and drive his daughter places when she needs a ride. (R. 220). Relatedly, Plaintiff reported that his ongoing mental health counseling "helps to a large extent," and that his medications help to a degree and prevent his more intense symptoms.[5] (*See* R. 45–46, 237).

---

[4] The Court also notes that Dr. Stack's assessments as to the nature of Plaintiff's mental limitations are generally consistent with the conclusions reached by Dr. Ferrin, the non-examining State agency consultant, whose opinion the ALJ afforded "some weight." (See R. 23, 87–89).

[5] It is worth noting that Plaintiff does have compliance issues with taking his medications. (*See, e.g.*, R. 222, 437, 451, 553, 612, 703).

Accordingly, after careful review of the record, the Court finds no error in the ALJ's assessment of the medical evidence. The ALJ gave good reasons for assigning great weight to Dr. Stack's opinion and less weight to Dr. Thalmann's treating opinion. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."); *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 497 (S.D.N.Y. 2018) (noting that the ALJ has authority "to resolve conflicts in the record, including with reference to a claimant's reported activities of daily living") (citing *Domm v. Colvin*, 579 F. App'x 27, 28 (2d Cir. 2014)); *Lamond v. Astrue*, 440 F. App'x 17, 21–22 (2d Cir. 2011) (affirming the ALJ's decision not to provide controlling weight to the opinion of a treating physician where opinions from non-treating examiners offered substantial evidence to the contrary).[6]

## 2. Residual Functional Capacity Determination

Next, Plaintiff asserts that the ALJ's RFC determination failed to consider all of Plaintiff's limitations with regard to attendance, concentration, persistence, pace, and social interaction with authority figures and co-workers. (*See generally* Dkt. No. 11, pp. 17–23). Specifically, Plaintiff contends that his "rapid cycling bipolar precludes him from sustaining the concentration needed to perform not only [his past work] but even simple, repetitive jobs eight hours a day five days a week; or to be present a sufficient amount of time to sustain

---

[6] The Court also rejects Plaintiff's argument that the ALJ erred by only assigning "some weight" to Ms. Ransom's third party function report. (*See* Dkt. No. 11, pp. 16–17; *see also* R. 220–27). Indeed, an ALJ's rejection of a third party function report is proper where the report is contrary to other objective medical evidence. *See, e.g.*, *Nelson v. Colvin*, No. 16-CV-3530, 2017 WL 1397547, at *13, 2017 U.S. Dist. LEXIS 57534, at *37 (S.D.N.Y. Apr. 4, 2017) (finding no error in the ALJ's rejection of a third party report from the claimant's family member which lacked objective support in the medical record). Here, the ALJ explained that she found Ms. Ransom's lay opinion "unpersuasive" because she was not a treating provider, and her opinions were based on "casual observation." (R. 23). The ALJ also wrote that "[t]he observations of a lay person certainly do not outweigh the accumulated medical evidence." (*Id.*). The Court finds no error in the ALJ's analysis or exercise of discretion in evaluating Ms. Ransom's report.

any employment." (*Id.*, p. 21). According to Plaintiff, the RFC limitations to "understanding, remembering, and carrying out simple, routine and repetitive non-complex tasks" were insufficient to account for the frequency and duration of his impairments. (*Id.*, pp. 18–22).

In response, the Commissioner asserts that "an RFC limiting Plaintiff to . . . simple, routine and repetitive non-complex tasks more than accounts for any credibly established limitations in concentration, persistence, and pace." (Dkt. No. 13, pp. 13–14). The Commissioner notes that Plaintiff's mental status examinations "frequently showed that [he] had intact attention and concentration, was fully oriented, had intact memory, and had average cognitive functioning." (*Id.*, p. 14). Moreover, the Commissioner argues that "an ALJ need not specifically incorporate limitations to 'maintaining concentration, persistence, or pace' in the RFC, where, as here, the medical evidence demonstrates the claimant can engage in simple tasks, notwithstanding his limitations, and/or where the RFC implicitly accounts for the claimant's actual limitations." (*Id.*).

To determine an RFC, the ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that finding does not perfectly correspond with any of the opinions of cited medical sources. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). According to the Regulations, the RFC must "identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." SSR 96-8P. Among those functions are mental abilities:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out

> certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. §§ 404.1545(c), 416.945(c). In addition, "[t]he mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF." SSR 96-8P.

Notably, the Second Circuit has consistently held that moderate limitations do not prohibit a claimant from performing unskilled work. *See Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010); *see also Sipe v. Astrue*, 873 F. Supp. 2d 471, 481 (N.D.N.Y. 2012) (holding that moderate limitations in "relating to instructions, concentration, [and] attendance" are consistent with unskilled work). Moreover, an ALJ need not specifically incorporate limitations to concentration, persistence, and pace where the medical evidence demonstrates that the claimant can engage in simple tasks, or where the RFC implicitly accounts for the claimant's actual limitations. *See McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014) (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)).

Upon review of the record, there is substantial evidence to support the ALJ's finding that Plaintiff had no more than moderate limitations for concentration, persistence, maintaining pace, interacting with others, and understanding, remembering, or applying information. Contrary to Plaintiff's claims, the ALJ credited Dr. Thalmann's opinion that Plaintiff's mental impairments caused limitations in sustained attention and concentration. (R. 22). Significantly, the ALJ's decision states that:

> While [Dr. Thalmann] did not elaborate as to how the claimant had limitations in sustained concentration and persistence, I concur that [Plaintiff] has limitations in this domain, which is supported by the record, and is reflected in the [ ] residual functional capacity. For these reasons, I give Dr. Thalmann's opinions some weight.

(*Id.*).[7] The ALJ also considered Plaintiff's function report, in which he stated that he has problems paying attention, can only concentrate for 10 to 20 minutes, and cannot finish what he starts due to problems focusing. (R. 18). In addition, the ALJ gave great weight to Dr. Stack's opinion, who found that Plaintiff had a "mild impairment in his ability to learn new tasks and make appropriate decisions," and a "moderate impairment in his ability to maintain a regular schedule, perform complex tasks independently, relate adequately with others, and appropriately deal with stress." (*See* R. 18, 19–24, 383). Based on this evidence, the ALJ found that "the claimant has moderate limitations with regard to concentrating, persisting, and maintaining pace." (*Id.*). Accordingly, it is clear that the ALJ credited all of the medical evidence showing that Plaintiff had moderate limitations with regard to concentration and persistence, and incorporated those findings into the RFC by limiting Plaintiff to "simple, routine and repetitive non-complex tasks." (*See* R. 19–24).

Similarly, as to Plaintiff's alleged limitations to interacting with coworkers and authority figures, Plaintiff does not point to any medical evidence demonstrating that he had more than moderate limitations to "interacting with others," as the ALJ found in her decision. Indeed, Dr. Stack observed that Plaintiff's manner of relating was adequate and his demeanor was cooperative, and Plaintiff reported socializing with friends and family regularly. (R. 233,

---

[7] Dr. Thalmann found that Plaintiff was "limited" in his ability to maintain "sustained concentration and persistence," an area that included Plaintiff's ability to: follow instructions; follow schedules; work with others; follow a reasonable pace; sustain ordinary routine without supervision; maintain customary attendance and punctuality. (R. 341).

382–83).  In any event, the jobs identified by the VE are unskilled positions which do not involve more than occasional interaction with supervisors, and typically involve dealing primarily with objects, rather than with data or people, and "they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis."  SSR 85-15.  Thus, it was not error for the ALJ to exclude such limitations from the RFC.  *See O'Connor v. Comm'r of Soc. Sec.*, No. 17-CV-6826, 2019 WL 1970514, at *3, 2019 U.S. Dist. LEXIS 75145, at *8–10 (W.D.N.Y. May 3, 2019) (finding no error where the ALJ declined to incorporate an RFC limitation because "unskilled positions [ ] do not involve more than occasional interaction with supervisors").

In sum, while Plaintiff claims that the RFC did not account for all of his limitations, the ALJ cited substantial evidence in finding that Plaintiff had moderate limitations for concentration, persistence, and maintaining pace, moderate limitations for interacting with others, and moderate limitations in understanding, remembering, or applying information.  The RFC determination sufficiently incorporated these limitations, and therefore, remand is not warranted on this basis.  *See Michael C. v. Berryhill*, No. 17-CV-1395, 2019 WL 1228553, at *5–6, 2019 U.S. Dist. LEXIS 42378, at *14–17 (N.D.N.Y Mar. 15, 2019) (holding that the ALJ properly accounted for the claimant's moderate limitations in maintaining a regular schedule by "providing RFC limitations such as 'simple, repetitive instructions' and limiting the amount of judgment and changes in the work setting"); *Martinez v. Comm'r of Soc. Sec.*, No. 16-CV-908, 2017 U.S. Dist. LEXIS 93475, at *20–21 (N.D.N.Y. June 15, 2017) (noting that the "Second Circuit has held that moderate limitations in work

related functioning do[ ] not significantly limit, and thus prevent, a plaintiff from performing unskilled work").[8]

## IV. CONCLUSION

Although Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision was supported by substantial evidence in the record. Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). After careful review of the record, the Court concludes that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

For the foregoing reasons it is

**ORDERED** that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case and provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:   January 29, 2020
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge

---

[8] Because the Court finds that the RFC was supported by substantial evidence, the ALJ's submission of the RFC to the vocational expert was not error. Therefore, Plaintiff's claim that the vocational evidence was tainted by an improper RFC determination is also without merit. *See Pardee v. Astrue*, 631 F. Supp. 2d 200, 212 (N.D.N.Y. 2009) (finding no error in the hypotheticals posed to the vocational expert where "the ALJ applied the appropriate weight to the treating physicians' opinions and the RFC is based upon substantial evidence").